Alright, Lisa, can we call the next case? 15-1572, Princeville v. DePaul v. State Farm Insurance Co. Good morning, counsels. If you could approach the podium, introduce yourselves for the record. Good morning. Good morning. Grace Wine, WEIM, representing the Appellants. Good morning. Jim Garner, behalf of State Farm. Alright, Ms. Wine, how much time would you like? Your Honor, I think a half an hour for the main arguments and ten minutes for... I'll give you 20 for the main and 10 for the rebuttal. We're doing a whole Turkish bazaar today. How long will 20 count? 20 is fine, Your Honor. Great. Alright. Thank you. Ms. Wine, you can proceed. Thank you. If the Court please. In this case, the plaintiffs are only seeking that the law of Illinois be uniformly and consistently applied as to all litigants without bias or prejudice and without special treatment. That is all the plaintiffs have ever asked for in this case. That is all we are asking for from this panel. The first thing that I would address is the request by the panel for the supplemental briefing on the joint legal defense. The joint legal defense, in a plaintiff's view, does not exist in Illinois as it has been utilized and defined by the defendants in this case. What we have in Illinois, based on the waste management case and our attorney-client privilege, and the case that really predated all this was People v. Ryan, was a situation where one lawyer can represent non-conflicted multiple parties. And that works for both the plaintiff and the defense. A plaintiff can come in and say they represent three passengers in a bus. They're all non-conflicted passengers in a bus. One plaintiff's attorney can represent all three. People v. Ryan was specific to the insurance model and said when an insurance company and their insured have contractual obligations to one another, have the same interests and are completely aligned, there's no conflict for one lawyer representing both of those parties. What the defense did here and what they have advocated here is a true departure from that. Waste management was not a situation where one lawyer represented both parties. Waste management actually was not a situation directly with regard to the attorney-client privilege. I do understand that, and I understand what waste management was. But waste management also talked about negotiations, pre-litigation discussions, and that sort of thing. And this is in litigation. So in waste management, they even said ultimately this is not the attorney-client privilege. And there was a dispute. The parties were ultimately in litigation. That's how they get to the Supreme Court. But the issue of whether or not those communications between the insurance company and the insured and the lawyer for the insurance company and then ultimately in the declaratory judgment action should have been privileged, the court said actually it's not an attorney privilege issue. The issue here goes to whether there's a contractual obligation between them to cooperate. Waste management counsel was a situation where the insured in underlying tort lawsuits had a lawyer. The insurance company did not retain that lawyer, did not talk to that lawyer. And yet when the insured and the insurer later fought over insurance coverage, the court said that the insurance company is entitled to discover everything that the insured said to its lawyer and vice versa, or attorney-client privilege, right? As I understand that ruling, they were saying you're included within the attorney-client umbrella, even though you didn't retain that lawyer. The reason the attorney-client privilege didn't have any application is because it didn't bar anything, because they were both within it. Am I reading that wrong? No, I think that's absolutely correct. But it's still, it was based on the insurance contract and the obligation for the insured who had his or her own lawyer in the underlying case. It was the fact that they had a common interest. It was not based on the contract. That was the other reason that waste management ruled. Waste management had two independent grounds, right? And the second one was the common interest doctrine. It was not related to the cooperation clause. Well, the common interest, though, flows from the cooperation clause under the contract. That was their common interest. That was their common interest. Wasn't their common interest the concept that they both wanted the insured to win the underlying lawsuit so neither one of them would have to pay for it? Well, that is certainly a common interest, but that's a common interest that's shared by every defendant in every lawsuit throughout the entire state. There's no defendant in a lawsuit that does not share that with a co-defendant. We want the plaintiff to lose. We're the defense. They're the plaintiff. We want them to lose. But then don't they have a secondary fallback position of, if we do lose, I want it on that guy and not on me? Well, sometimes they would, and then they would be conflicted, I suggest. They would be conflicted there. So the determination of the conflict wouldn't come up until you're well into litigation. Is that correct? Well, I think that would be fact specific. I think in certain cases they would know from the outset or should know from the outset with some very basic investigation. For example, I mean, if someone says, you know, they stole my car, they're not my agent, they stole my car and got in the accident, versus someone saying, no, I gave it to them. You know, they know from the beginning that the person that says that the other person stole the car, they're in conflict, and they would know that from the beginning. Maybe it's something that might develop as things go on in the case, in which case if there's a conflict they have to diverge. So what Judge Garcia found in this case is that from the point of the plant filing the complaint, from that point on everything was privileged, correct? Yes, that's what he said. And there was no requirement for any privilege law or any determination of what exactly transpired between the parties, correct? That's what he ruled. Okay. Yes. I might be dragging you further along before you're ready to go there, but I'm going to jump ahead. Okay. If they had tendered a privilege law to Judge Garcia and he went through the privilege law, would your argument fail? Well, I can't answer that because I don't know what the privilege law would have done. We don't know. We're talking about oral conversations. Well, again, we don't know. I thought there were answers to those questions, and the specific answer was only oral conversations. There are no documents. There were clearly communications between them, between the lawyer for State Farm and the litigant, the actual defendant, Mr. O'Day, and Mr. O'Day's ultimately down the road, their lawyer, because State Farm ultimately then claimed with the trial court that these were strategy and that it would capture strategy by disclosing, and they claimed thousands of e-mails. So we know there were thousands of what? E-mails. Okay. Let me ask you this. Is this really an apt analogy for you to claim that waste management really controls this case when the complaint was filed as a civil conspiracy? And isn't it really kind of difficult to suggest that for conspiracy cases, the joint defense privilege doesn't exist? Respectfully, I do disagree with you. The conspiracy alleges that people conspired and got together to do something. Yes. Okay. Well, then generally in those kinds of cases, criminal context, civil context, you have parties that are basically aligned in the sense that they each have attorneys, but the privilege would generally exist in this situation if the lawyers with the parties proceed under a joint defense agreement. Except in a conspiracy, the allegation of conspiracy, the plaintiff, whoever's alleging conspiracy, is saying these guys are in it together. Exactly. Okay. So doesn't that complaint frame kind of the issues here, and it's really not like the waste management case at all? I think that we certainly have conspiracy as one count. That is only one. That was the initial count you pled, and then you added some other count. But your initial pleading was a conspiracy. That's correct. The report is absolutely correct on that. Generally speaking, wouldn't you agree that all the case law from around the country suggests that in a conspiracy situation there can be a joint defense agreement? Certainly around the country there are multiple jurisdictions that permit that, but I would suggest that Illinois does not. Are you aware of any case that would suggest to the contrary? Specifically, as you framed it, no, but in terms of the analysis of it, whether there are conflicts then in the conspiracy, whether there are conflicts between the parties, and whether they're conflicted, yes. But in what you framed, can I cite you a case today that says that if there's a conspiracy count and they have agreed that they want to work together, do I have a case? I do not have a case to cite you. Isn't that what your case is really all about? The conspiracy, isn't that the guts of your complaint? No, that's one count of the complaint. The guts of the complaint was the abusive process and State Farm's involvement. It is and still is an abusive process. Wasn't that dismissed by the trial court on several occasions? Well, no. It was dismissed initially. It was repled. It was sustained against Mr. O'Day. And it was dismissed as to State Farm, but solely on the vicarious liability aspect of it, not on the underlying tort, not on the underlying tort of the abusive process. It was the ‑‑ What would be your best case then for vicarious liability for State Farm as the client hiring an attorney? At the present time, I would say that the best case on that issue was the Della Jordan case, which is an appellate court case. A Dellatory v. Safeway involved an insurance company. Dellatory says, look, the insurance company has the right to direct under the contract to direct litigation. It has the right to control litigation. It has the right to pick the lawyer. And the insurance company cannot sit back, wash its hands and say, well, you know, I hired this guy on behalf of you, the insured. And in this case, State Farm hired him on behalf of themselves and their insured. But I wash my hands of everything you do. Dellatory was involving litigation. This case involves litigation by the insurance company on the insurance policy. There was a petition for me to appeal to the Illinois Supreme Court after Horowitz, which is what the defense claims is their main case on the issue. Horowitz had already been decided. And Dellatory goes up on a petition for me to appeal. The Supreme Court said no. They let it stand. And they let that stand with an insurance company is responsible for the lawyer they choose and what that lawyer is doing in the course of litigation. But in order to get where you want to go, you do have to show that they control the litigation, don't you? Well, under the contract says they control the litigation. And, yes, there are three ways for them to carry a liability. One is their direct agent is a matter of law. The law says that it's a litigation. You've hired them. They're your agent. That's one way to do it. The other way is that if they're an independent contractor, that they control what the independent contractor was doing. That's a second way of vicarious liability. And we've alleged in the complaint all the ways that State Farm was controlling what their lawyers were doing. This is very different from Horowitz, which was not a litigation. It was kind of a one-off thing, one letter by one lawyer on one case. We have thousands of cases here. The State Farm was getting reports. They were getting monthly reports. They were getting 15 forms. When did you file this? What are you doing? Where is this going? Constant involvement in the case. How fast is it going? How are we getting our judgments? Where is the money? Is there any evidence in the record with your four underlying cases that they were controlling the litigation, State Farm versus Mr. O'Day? Well, yes, in the sense that we know that they were getting reports. We didn't get the reports because they refused to produce them in the discovery. But we know from the deposition of Mr. McCann that they were, in fact, getting reports. Does it matter in this case that the record reflects that for the other four main plaintiffs? There are now four. There started out three. There were four. One of them occurred during the course of the litigation. Is there any question that in each of those subrogation actions that the plaintiffs here were liable in the underlying actions? Was there any contest that they were at fault? Yes. Which one was that? Selby, Frank Selby, there was a contest as to that. On Adriana Lopez, there was a contest on that. What was the contest on Selby? Selby was actually a four-car accident. Mr. Selby and the plaintiffs insured were two vehicles on the railway. Two other vehicles on the railway were what we, but the street was Selby. Why was Selby in the four-car? Well, he was in this opposite position of the State Farm insured's vehicle when two other vehicles that appeared to be drag wrestling came into the intersection, struck one another. One car hit Mr. Selby. Mr. Selby's car hit the State Farm. What was the eventual outcome for Mr. Selby? Mr. Selby lost at the trial. And you're saying he contested liability from the get-go? He did, yes. And was he the one that there was two defaults vacated or not? Yes. The first, yes, he was. In his case, the first one was vacated because there was, at least according to the record, there was a default judgment entered without service. There was absolutely no service in the record. There was just. And was he subsequently served? He subsequently voluntarily appeared after there was a determination that he was served. He still maintained that he was, in fact, not served. But there was a determination that he lived by the determination of the court, voluntarily appeared, and defended the case. And the other three, what was the result in those? Other than the statute of limitations case. I was just going to say, on the Scheide case, statute of limitations, she should never have been subjected to any of this. They knew at the filing that that was the Scheide report. Who knew at the filing? Well, certainly State Farm and O'Day did. When State Farm tendered the complaint to Mr. O'Day, had the statute run? Based on the records we have, it does not appear so, but we never had an affidavit from them as to when they actually did it. The records that we did say indicated that someone sent something to O'Day. There was never any information in the record, and we were never able to get full claim files to say when, in fact, O'Day received it. However, what we do know is that when O'Day billed for it, he billed for the filing fee after the statute ran. So there was that indication to State Farm that they're getting billed for the filing of a lawsuit that the statute had already run when the filing is incurred. So there was that little bit of information, and as you know from the record here, we were certainly truncated in what we were permitted to obtain with regard to these cases, the main plaintiff's cases and the overall scheme that we alleged occurred throughout this case. Didn't every single case go to a default judgment for one of appearance? Every one of these plaintiffs? I mean, you eventually got them all vacated, didn't you? I did, every one of them. And maybe on more than one occasion? I did. There was a default on the Mr. Young's case. There was a default on it, but, Your Honor, respectfully, the judgment entered in that case was based on absolutely no proper service. Not only was he not served by the sheriff, but the person that allegedly served him and filed the affidavit of service was never appointed by the court. And as this Court knows, and there's just legions of cases say, you know, somebody handing you a piece of paper without proper authority to do so, that is not service. I'm not here to argue about the trial judge that has multiple things. You know, I'm not critical of the trial judge who's presented. You know, they're not going to have to go back to investigate. But the fact of the matter is, there was no service in that case. So there were default judgments, but there were default judgments that should never have happened. And in the Scheibe case, you know, she was downstate. They did Secretary of State service on her. On Frank Selby, he, you know, not to really belabor this, but weren't some of those defaults over a year old before you actually attempted to vacate them? Was that a notice to you? Well, let's backtrack a little bit. First of all, to me, like, on Scheibe, I wasn't even hired to represent her. On Selby, Mr. Selby was in contact with us. Mr. Selby says, I didn't get served. I was never served, which is consistent with that. Mr. Young was in the hospital during that period of time, and we couldn't find him. And respectfully, it took a while for us to figure out what Mr. O'Day was doing. Like I said, I have no criticism of trial courts who didn't figure out what he was doing. So at the time of Mr. Young, which is the earliest of the cases, I had no idea how to find this man. Eventually we find out he was hospitalized during all of this period of time. He was unavailable. The place where they claimed to have served him was owned by his brother, who looked very similar to him. And so that is Mr. Young, and I'm missing someone. Oh, Adriana Lopez, which was, Adriana Lopez was not a named insured under the policy, and she was defended under a reservation of rights under the insurance policy. So we had no information on her that you would really normally have with an insured. So she's an outside person that somebody that the insured may know that somebody has sued, being defended under a reservation of rights, and ultimately she paid nothing, and nothing was paid. I'm sorry. She paid something, money back. There was a reservation of rights. The insurance company ultimately paid nothing and prevailed in that lawsuit. So on the Adriana Lopez lawsuit, she ultimately prevailed in that lawsuit. On Martin Young, like I said, so that accounts for all of them. So, yes, there is a time period, but respectfully, people do not have an obligation to be scouring court records to see if somebody is suing them until the court has jurisdiction over them. And in this case, this court, no, not this court, the trial courts did not ultimately have jurisdiction until way after that. They had no obligation to do anything. The obligation to follow a case, to look at the case, to know what's going on is once the court has jurisdiction, which they never had in these underlying cases. And that makes perfect sense because the court cannot impose obligations on a party over whom the court has no jurisdiction. So we could never have rules that say before we get jurisdiction over you, a citizen on the street, you need to make sure nobody's claiming that they have jurisdiction over you. And then, of course, we're diverging off of that, but in these instances, we've alleged in the complaint, Mr. O'Day was hiding the returns. He wasn't filing the returns. He was, they were not in court files. So even if somebody said, hey, Joe, I heard your name called out in court when I was there yesterday. You might want to check to see if anybody thinks they're suing you. In the court, it's not there. There was no service there. O'Day, though, is in this lawsuit. We're not really here about O'Day today. I agree. But O'Day was hired by, supported by, and upheld by State Farm. State Farm chose him. State Farm supported him. State Farm, the complaint alleges, knew what he was doing or should have known what he was doing. They were auditing him. They were doing financial audits of him. They knew whether he was paying for the sheriff or not, if they were properly doing the audits. And the complaint, the complaint dismissed as to State Farm on this vicarious liability action was audit 2615. How do you respond to the argument that none of the underlying plaintiffs ever were assessed false? Does that make any difference to you? It doesn't. And why not? And it doesn't make any difference because, first of all, there's leverage in adding false to the judgment and getting it on a garnishment. So now if some, as like Adriana Lopez was, some person that may not be insured and somebody says, well, I have a judgment issue and it's for $10,000 plus my cost of $700, so you owe me $10,700. Well, I'll pay you 50%. Okay, 50% is still higher. You've still used that leverage. First of all, you have the judgment, which is leverage. You have this additional cost, which is leverage. And even if you're on bookkeeping, you say, well, I told him it was 10-7. We all know it was only 10. Well, what about judgment? Didn't you just tell us that before? Only one had a judgment entered against them? Oh, no. These were all, they, young had a judgment. No, all of them had judgments. Every single one of them had judgments entered against them. And there were costs assessed in those judgments. And so those, the fact that they, that State Department owed, they got caught? I thought Lopez didn't have anything entered against him. Eventually. Eventually. Yes. And isn't that the same for all four? In terms of eventually? Yes. You're trying to say none of them ever were. Right. When eventually, that's correct. They never had any out-of-pocket payment to the costs unless the payment that O'Day took from Adrian Lopez before she realized what was happening could be assessed to cost them. We don't know that. We know that they took money. We don't know how it was apportioned. But ultimately, it doesn't matter because that is not an element of the cause of action. It's a potential damage to all of them. The element of the cause of action has to do with the improper purpose. So it becomes important because what was the purpose of the act for O'Day and State Farm? What was their improper purpose in this bad service? And one of it was O'Day's pocketing over $100,000. I think it's close to $140,000 as we've calculated at this point that he's pocketing that should have gone to the sheriff. And State Farm, we've alleged, knew it because State Farm was auditing and they certainly should have known it. Well, do we have the auditing documentation? No, we did not get it. We know of the existence of the auditing. They refused to produce the auditing. So you're in a position that the auditing clearly disclosed that State Farm was well aware of it? Yes. Yes. If it was done properly? Yes. And other documents that State Farm refused to produce. And when the trial judge asked you what you needed, did you ever say that that was one of the documents? I did not say it at that point. What I said at this point, and I've said to you, I'm pretty much opposed to what I said to Judge Garcia. At this point, Your Honor, this is what I need to see what I need. And at that point, I still needed some documents and some other information. And the judge gave me that. But then when the time came for the ultimate summary judgment, I said, but I still don't have enough. And he said he had enough. And that's where we were on that. I would like to talk briefly about the 2615 and the standards under 2615. The arguments under 2615 are really very simple because you have to take, one, has to take the complaint as it's presented. The four corners of the complaint doesn't state a cause of action. We have alleged the vicarious liability of State Farm in that complaint with regard to a date on the abuse process. State Farm's defense or representation under 2615 was, well, we didn't know, we didn't benefit, they attached a transcript which was wholly improper. And all of those things are potential defenses. It's a potential defense if the allegation against State Farm on this vicarious liability of agency is, well, we didn't know what he was doing. That's a potential defense. Well, we may have known what he was doing, but we didn't really understand the implications of what he was doing. That's a potential underlying defense. We didn't get a benefit. Well, maybe that's an underlying defense. But that's not the issue on a 2615. It doesn't matter. It doesn't matter if they would ultimately 100% win eventually. The issue on a 2615, which is how the trial court dismissed the vicarious liability against State Farm, is does this complaint, when you look at it and take every single allegation in that complaint as true, which you must do without consideration of any potential defenses to those allegations, does this state a cause of action? And the only cause of action for abuse of process is improper service, improper use of the court service, which we clearly had here, and that was race judicata based on Sarkeesian, for all of these things, and an improper motive. And what was the improper motive? Well, we allege the improper motive. For Mr. O'Day, it's pocketing for money. For State Farm, it's getting their cases rushed through the system a lot faster than anybody else's. They get their judgments. They have their leverage. They have their costs. For the people that didn't know what he was doing and ultimately maybe still don't know what he was doing, they may have paid it, the whole thing, all the judgment. In these particular cases, they were thwarted. But the fact that they were thwarted doesn't undo the improper motive. But don't you have to allege that State Farm directly controlled this or directly authorized it? Actually, I would say that if I used those words, that would be improper because that's the conclusion. We factually allege. You have to allege facts to show that they directed. We did say that in the complaint, allege that the insurance contract allows them to direct, and they did, in fact, direct the litigation. So that is alleged in the complaint. If that's all we did, I think we would be subjected to a motion to dismiss because we didn't allow the facts. So what facts do we have that they directed the litigation? And we've alleged all of those facts in the complaint. They knew about it. They knew what he was doing. They had other lawyers. So Mr. O'Day is not their only lawyer, but somehow his cases were really getting through the system fast. Other lawyers were plotting through the system, getting service, doing it properly and professionally. But Mr. O'Day's were streamlined, and Mr. O'Day's judgments were full amounts, which was a month. He got full amounts of the judgments and costs where if he had been doing it correctly, that would not have been the case. And we did allege that in the complaint and the 2615. But the court, when ruling on the 2615, specifically talked about things that should not have been considered. Specifically, the court said, well, I don't see where State Farm benefited from this. Well, just give us one example of how you actually factually pled that State Farm controlled the litigation, you know, unlike another client that hires a lawyer. I believe it's in like paragraphs 44 to 56. We allege that State Farm, well, we allege that they picked the lawyer, but other litigation they would pick. But we allege that they had the team. Does any case suggest that hiring a lawyer is control picking? You know, because you select a firm, you're controlling the litigation? No, but the contract provides for the direction and control of litigation. So we've alleged that the contract itself, we allege, and that's alleged in the complaint, that the contract says State Farm reserves the right to control the litigation. State Farm was requiring 15 different forms, micromanaging how this litigation was proceeding. But that's all in the complaint. It is in the complaint. All right. It absolutely is in the complaint, that all of it is there and all those allegations. In addition to the benefit, which, respectfully, I don't think we had to allege what the benefit was, because, again, the vicarious liability, our first position is there was vicarious liability because he was an agent and attorney representing a litigant hired by an insurance company, and that's deletory. He's in there. He's theirs. They don't want him. They hire somebody else. They fire him. It's very simple. But they kept him. He's theirs. If that fails, then he's an independent contractor whose conduct was ratified. And we've got the ratification. They knew about it. When did they know? We allege they knew before the complaint, but there's no question that as of filing the complaint, they knew. And it would really have been a very simple thing. If they were questioning whether the complaint's allegations were factually correct, you're talking about a few hours' worth of work. All you have to do is call them a day and say, hey. Do you want to say anything about your summary judgment or not? Yes. On the summary judgment, Robodeau versus Oliphant is controlling in the state, 191. It absolutely requires, without exception, that every single document be attached to the complaint. That did not occur here. Not only did it not occur, some of the documents upon which the affidavit relied were not in my possession, and the trial court never saw them. That is a Supreme Court rule. That is without exception. The subsequent cases, Perez versus Brinton, say that it's fatal to not do that. The Supreme Court said it's a non-emergent technicality. And, in fact, the defense brief doesn't even reference that case. When you look at their points of authority, they don't even talk about that case. But what they say is, well, we were supposed to attach. It was too voluminous to attach. Well, respectfully, the Supreme Court has not carved out that exception that something is too voluminous. The Supreme Court says you must do it. And there's a reason. We send people to life imprisonment, and when we have the death penalty, to death, under a standard which is beyond reasonable doubt. The standard on the summary judgment is clear and free from doubt, which means that standard is higher. It's the highest standard under the law, and that's why the Supreme Court says every single document upon which a litigant relies and an advocate relies to get summary judgment has to be attached to the motion. Not only was it not attached in this case, it was not known in this case. They withheld documents from me. They withheld documents from the court. They did not provide a privilege lock. Their claim that these documents they withheld were privileged, we don't know. We apparently have to take their word that they were, in fact, privileged, but we don't know that because they didn't do a privilege lock, which even the Illinois Supreme Court in a case with Justice Thomas was involved in litigation. The Illinois Supreme Court justices had to provide a privilege lock on their communications. But State Farm does not have to provide a privilege lock and did not have to provide a privilege lock in this case. So it all comes together into one large package, which is that the plaintiffs were just not given a fair shake. We were not given discovery, and this class discovery that they defined, it doesn't exist the way they defined it. We were entitled to that discovery when we filed the lawsuit. Judge Mackey understood that, and then, you know, we went through five different judges, and in the plaintiff's view, based on misrepresentations to the various judges about what the status of the case was, it just got cornered up. So all of the evidence that would have shown, and now we've got two years later, and much has gone on, and we did file a motion for this court to take judicial notice. Two months after State Farm gets out of the case, Mr. O'Day is filing a motion that says, oh, by the way, State Farm had identified 500 cases that met the class criteria, 500 cases. But while State Farm is in the trial court, they're standing there saying, we don't know what she's talking about, we don't know what's going on, we don't know anything, yet 500 cases they had already defined and articulated what those 500 cases that met the class. But we weren't allowed the discovery because they conflated this. They just decided they would do the new nomenclature, just like they did respectfully on the joint defense. We'll just provide new nomenclature for this, and we'll just say, okay, now this is class discovery. She doesn't get that. Whatever was going on by the time their last affirmative defense was stricken by the trial judge, we were at issue, and there should have been full discovery without limitation at that point. And it wasn't. I mean, the trial judge made us continue on. And that's why I don't want to take up all your rebuttal time as well. Okay. Do you want to sum it up? Yes. Just in summary, in this case, privilege log is everything must fail because we didn't have a privilege log. We know the summary judgment clearly failed under the Supreme Court rules. The 2615 was clearly not decided solely based on the allegations in the complaint. Agency is a question of fact. Ratification is a question of fact. Independent contractor is a question of fact. All of which are supported by the court's deletory decision, which says that an insurance company hires a lawyer. He's theirs. And we believe that this should be reversed. Thank you. Thank you. That's fine. Mr. Gaughan. Thank you. May it please the court, Jim Gaughan on behalf of State Farm. Your Honor, plaintiffs are attempting to hold State Farm vicariously liable for the legal judgments of an attorney of day. As the Supreme Court set forth and forwards, a client is not vicariously liable for the legal judgments of his lawyer unless the client specifically addresses or specifically directs, controls, authorizes, or ratifies, and this is important, the precise method of conduct alleged. What about counsel's statement just a few minutes ago that the contract between State Farm and Mr. O'Day allows State Farm to control the litigation? Right. I believe if you look in the complaint, the contract she's referring to is the contract between the insurer and State Farm. And that's the deletory case, by the way. That's where an insurance company hires a lawyer to defend a claim that is made against an insurer. Is there any contract in the record then that she's referring to between State Farm and Mr. O'Day? There is a contract between State Farm and O'Day that is in the record. However, she cannot allege or claim or argue that that contract in any way allows State Farm to control Mr. O'Day's legal judgment. It specifically says otherwise. What does it say? It essentially says that State Farm does not control Mr. O'Day's legal judgment. I'm paraphrasing. Yes. All right. Go on. So plaintiffs claim that Horwitz doesn't apply and attempts to hold State Farm under an agency theory. However, Horwitz does apply. And both Judges Billick and Garcia dismissed plaintiffs' abuse of process claim against State Farm when following Horwitz. And based upon the facts alleged, Mr. O'Day was clearly exercising his legal judgment. He was assessing the sufficiency of the service. By the way, plaintiffs use the term there was no service. I'd like to clarify, when she says there was no service, she's saying there was no effective service. As you can see from the documents attached to the O'Day affidavit, there were returns of service for each and every instance where service was in dispute. Plaintiffs can argue whether that service was effective or not. But when she says there was no service, that gives the impression that there was no return. And there is a return each and every time at issue here. So when we're dealing with assessing the sufficiency of service and then determining whether or not to move for a default judgment, that is the very area where a client should not be expected to supervise a lawyer. And that was the gist of what Horwitz was about, where it set forth the public policy that lawyers should be lawyers and clients should be clients. Lawyers are subject to a variety of canons of ethics and duties and all, and the client shouldn't be the one that is vicariously liable for those legal judgments unless those legal judgments were specifically directed, authorized, or ratified. And there are no facts alleged in the complaint that would suggest that State Farm specifically authorized or ratified or controlled the specific issue here. But if they had an audit going on, wouldn't it reveal that there were certain costs that he was putting out there that weren't valid costs? Wouldn't an audit have revealed that? No, we're talking about a financial assessment, and frankly, the assessment looked more specifically to the monies that Mr. O'Day was collecting. And they weren't bearing down into the specifics of what? In this case, no. There was no identification of any cost issue in this audit. And did that come out in discovery, or was that also privileged communications? It did not come out in discovery. Counsel, can we talk for a minute about the common interest doctrine or whatever joint defense doctrine we'd like to call it? Absolutely. As you've argued this, and I think as most of the courts have talked about it outside of Illinois, the conversation has to take place in furtherance of whatever that joint interest is, that common interest is, right? You can't just talk about anything in the world. It has to further the common interest, right? And it can't otherwise be waived, right? And it could be waived, for example, if there were non-clients and non-lawyers in the room. That would be an example, wouldn't it? Okay. In this case, if Judge Garcia was correct in finding that this doctrine exists in Illinois, or should be recognized in Illinois, I don't think Judge Garcia thought it already existed under Waste Management. I thought he thought it was more akin to, you know, the joint defense doctrine or whatever in federal court. If he was right about that, was he right in making a blanket ruling that everything involving State Farm-All-Day Communications post-lawsuit were covered by that privilege? I don't believe he made that blanket ruling. What we were dealing with was a motion to compel with regard to various interrogatories and document requests that basically says, identify for me all of the communications between Mr. O'Day's lawyer and State Farm's lawyer. And we objected on a variety of grounds, including over-breath, relevancy, why are the communications that I would have with O'Day's counsel relevant? And we also objected on the grounds of the joint defense communication. Well, let's just stick with that privilege, that argument. Right. So I read your response to the interrogatory that asked whether anybody from State Farm had ever notified anybody from O'Day of any irregularities in the handling of the sub-bill claims. And your response was State Farm and O'Day, I am paraphrasing now, post-lawsuit, State Farm and O'Day did meet and discuss these matters with the involvement of counsel. That's correct. And that's the beginning and the end of your response, right? That's right. So if there were several conversations, several instances of communications, whether they were, I didn't think they involved documents. Am I right about that? The documents as to the issue that you've just framed, no documents. It was just all like in person or phone or video conference? That's correct. That's correct. But with regard to other documents that you could assume would exist would be communications between counsel for O'Day and me, for example, exchanging draft pleadings and the like. So there would be those type of documents that would exist. Okay, but the question was did State Farm ever notify O'Day of problems in the handling of the sub-bill? Wasn't that the interrogatory that spawned the joint defense privilege? I believe the interrogatory was did O'Day notify State Farm, if I recall correctly. Okay, so either way, your response was just that State Farm and O'Day met with the involvement of counsel and discussed these, but we're not going to tell you what happened. How can we know that, don't you need to know the details of those conversations to know whether the privilege applies? I mean, how do we know that these conversations were furthering the common interest? How do we know who was in the room? How do we know it wasn't waived by the presence of a third party? How do we know that the clients are really the clients as we understand a client for a corporate, for a corporation in Illinois, the control group and all that stuff? It seems to me like the judge has said there is a joint defense privilege, those communications are privileged, end of story. Was that the right ruling or would it have been more appropriate for the judge to say, well, now I'm recognizing the document, now let's see if it applies based on specific communications, some kind of an in-camera examination, something like that. Why wouldn't that have been a better way for him to go? Well, first of all, as you framed the issue, it wasn't addressed. So if there was a specific question, for example, tell us who was in the room. We would have disclosed that because it would have only enhanced the fact that there were only lawyers in that room. Were you asked to do a privilege log? We were asked to do a privilege log of all communications. Including the ones we're talking about? Well, that would have included that, but the request was overly broad. Fine, but I'm just talking about these communications right now. Right, but the point is, I'm sorry. Well, I mean, I'll give you a chance to say whatever you need to say on this. I'm not trying to cut you off, but the plaintiff, I think one of the plaintiff's arguments here is you should have to log that. You should have to log those conversations. And the way you would log a privileged conversation, you obviously aren't going to give up privileged information, but the detail. Who was in the room? What was the date? What were the general topics discussed? However you would do the privilege log. And then there would be, I would expect at that point possibly, if there was some reason for further litigation on it, some kind of an in-camera review by a judge. Would that have been a better way to do this than to just hold all of those conversations to be blanketly privileged? Well, you're saying all of those conversations. The point of litigation. You're talking about ensuring the privilege of it. So that's what we're looking at, Your Honors, is a blanket request for a privilege log as opposed to a focus request. If there's a blanket request. Well, how did the plaintiff know who was in the room or what dates to that? What date basis even occurred? Right. Well, specifically that wasn't framed to Judge Garcia. So what we're doing here is we're skipping over Judge Garcia and raising a scenario, a debate, that he did not specifically address. He did not specifically rule upon that. So you're saying that the plaintiff never requested a privilege log for all of these communications that Judge Garcia deemed privileged? She certainly requested a blanket privilege log. And the objection was is that was overly broad and unnecessary. There wasn't a subsequent request to say what I really need is who is in that room. And if she did do that, we could have provided her that information. That wouldn't have led anywhere. It was the point that she wanted. And she referenced all the e-mails, which essentially would be exchanges of draft pleadings between myself and counsel for all day, which had no relevance whatsoever. Those were the types of things that were included in this overly broad request. And if she specifically told us what she wanted, and if it was specifically that conversation, and she wanted a specific law with regard to that conversation, she would have gotten it without debate. But that's not what happened with Judge Garcia. So is it your point that any time a plaintiff is requesting information and the defense is asserting a privilege, that if the plaintiff's request is overly broad, that the trial court does not have to narrow it? The trial court can just give a blanket, privilege applies, that's it, you're done? Is that your position? Well, my position is, is that there is case law that says that if the request is overly broad and not relevant, those objections can control what the communications are between myself and counsel for all day and drafting a response to a pleading. But as I understand it, the interrogatory said, did State Farm ever notify all day of any irregularities in the process? In the handling of the subrogation claims. And I didn't read the definitions in the interrogatory, but they look like every other definition section. It meant that anybody from State Farm tell anybody from O'Day's office. It didn't even mention lawyers for that matter. And your response, you asserted all the privileges you needed to say, to assert, and you said it's subject to that. Yeah, post-lawsuit filing, yeah, State Farm and O'Day had conversations that are responsive to this, with the involvement of counsel, period. So she said, did anybody from State Farm talk to anybody from O'Day? And your response is, State Farm talked to O'Day with the involvement of counsel. I mean, that's it, right? I mean, how are we able to glean from that? And you're saying there were no documents. Somewhere in there you also said there were just oral conversations. How is anybody supposed to glean from that? How is the plaintiff even supposed to know how to follow up other than to just say, you know, that's not enough? That doesn't demonstrate a privilege. I mean, you have the burden of proving a privilege, right, or of asserting a privilege. You're just saying somebody from State Farm talked to somebody from O'Day with the involvement of counsel. You didn't even say that the lawyers were in the room together, did you? I mean, I'm hearing you now saying the only thing responsive to that issue, this joint defense privilege, is lawyer to lawyer. Can I hold you to that, or are you not? I won't if you're not certain. There were four people in the room, and they were all lawyers. It was all lawyer to lawyer, lawyer to lawyer. No clients in the room. In-house counsel, Mr. O'Day, Mr. O'Day's counsel, and me. In-house counsel for State Farm? Correct. And you. Yes. And Mr. O'Day. Right. Who is not an attorney, and he's the client, right? He's the client, but he is an attorney. Right. But he's the client for this case, right? Yes. Okay. Are there any discussions in that room with in-house counsel, yourself, O'Day, O'Day's lawyer, where O'Day or his lawyer suggests that, you know, whatever, some kind of possible wrongdoing. What is your argument? Clearly that's going to be privileged if you're in this joint defense agreement. That's right, Your Honor. We are trying to understand what happened based upon what the allegations of the complaint are in order to identify what our mutual defenses will be. That is the very definition of the common interest privilege, is understanding, you know, what happens so we can identify a joint defense. And I'd like to emphasize that whether a specific law was needed there was not framed for the trial court. So this is something that is leaping over what was specifically asked of the trial court. Fair enough. But in this whole fight for discovery, you bore the burden of persuasion to assert the privilege. It was your obligation to say the joint defense doctrine applies. I don't know if that's the best doctrine name, but that's the name you used, and that's fine. I mean, you even say in your brief, in order to establish the existence of this privilege, you have to show that communications were made in the course of a joint defense effort. I guess you've said that. The statements were designed to further the effort, and the privilege has not been waived. How can you possibly, how could the judge have possibly found, The judge could find that the doctrine is recognized in Illinois, but how could the judge have found that the statements were designed to further that effort, and the privilege has not been waived, when the judge couldn't possibly have known whether either of those two things were true? Even though he specifically said, Mr. Don, I want a privilege law, how could he possibly have known whether each specific meeting and each, you know, whatever happened within those meetings were covered by the privilege? Because that was what the framework was of what was presented by a plaintiff. How a plaintiff was attacking these issues. Plaintiff was attacking these issues by saying the joint legal defense doesn't apply. She wasn't arguing waiver. She wasn't arguing that. But how could she possibly argue waiver? She didn't know who was in the room either. Well, that would be the point. She could at least raise the specter of waiver, and therefore bring that issue. She could have thrown these issues out. That's correct. The way that she was handling this was to say, I'm sorry. Doesn't she have an obligation to present that argument to the trial court so that we can determine one way or the other whether this issue was ever even facing the judge? Absolutely not. And you're saying it never, ever was addressed or suggested or argued by counsel. Her whole argument rested on the idea that the joint defense privilege, or whatever you want to call it, common interest, I don't think the name is dispositive, but that her whole position was based solely on the idea that the joint defense agreement or this notion of it could not prevail or resolve or in any way make the court decide this because it doesn't even exist. That was her primary argument. I will say there was an ancillary argument, which was there wasn't a common interest between O'Day and State Farm, and that suggested that there was some conflict between the two. And we argued. We addressed that point. We addressed the conflict point. If there was a waiver argument, we would have addressed the waiver argument. If there was an argument that said, I need to know who was in that room, we would have addressed that argument, and Judge Garcia would have ruled upon that. But that's not what happened. Are there any more issues as to the joint defense doctrine? I would mention one other item, too. It's the plaintiff's rule 191 affidavit. There are actually two. I don't know if Your Honor saw that. There was one that was stricken, and then there was a second one that was revised, and it's in the record at the supplemental record at 422 to 426. And that's important because you're not going to find any of the issues that we heard today in that rule 191 affidavit. You're not going to see anything about privilege communications, joint defense communications. You're not going to see anything in there about a report, an audit. It's not there. So if you have a summary judgment litigant that has lost and now claims that they need more information, you look at the 191 affidavit to see what the basis for that position would be, and you look at that affidavit, and you're not going to see any connection whatsoever with regard to the issues that we've heard today and in these briefs. Thank you. Thank you. Would Your Honor say anything more about the 615 issue, the summary judgment issue? Well, what about that 615? She said the facts are there, they're pledged, and the court shouldn't have decided that as a matter of law. Right. The facts are not there. I believe Plaintiff wanted to present an agency theory as opposed to Horowitz theory. Now, she'll put in the word control or authorize or like, but there's no factual support. And when she was at this podium, Plaintiff's counsel was specifically asked, you know, what supports those conclusory allegations? And she said the contract. Again, the contract she's referring to is the contract between the insured and State Farm. That is a completely different scenario here where this is a segregation matter in the name of State Farm, which she says this was filed on behalf of State Farm and the insured. That's not the case. It's on behalf of State Farm. So in that case, State Farm is the client. Horowitz controls. There's an obligation to make factual allegations meeting Horowitz, and that was not done. Okay. Anything else? No, Your Honor. Thanks very much. Okay. Thank you, Mr. Gunn. Ms. Hoy? Very briefly, with regard to the 191, the court had already ruled that we didn't get any of those things. So saying this is the additional stuff we needed would just have garnered another argument with the trial court. It's on page 22 of the brief, the quotation from the trial court on that issue of the joint legal defense and the privilege law, where the trial court says to me, I don't understand why you want a privilege law, anything post-litigation. And I said, well, Judge, it's still required. And it really does beg the question. Without the privilege law and just this blanket joint legal defense, I don't know what to ask for. Because first I need to see. But you responded to counsel's suggestion that your position in the trial court was that the joint defense document doesn't exist. It actually was my position. And it's kind of your position here. It is. But there was the additional argument, which was all through the trial court and is presented here, and I wanted to address it. Even if it didn't, because I did go on. I didn't just stand there with my arms crossed and say it's not there. If it was, they were conflicted from the beginning, and they never should have been permitted to have this joint legal defense. So these interrogatories, those were very initial interrogatories to see, well, what do we have? How many times did they meet? Was there any information? And we got stopped from, I mean, the door was just shut. You're not getting any of this. How do you know, say, they were conflicted when your complaint charges conspiracy? Well, it's alternative. We can't alternatively plead. So there's a count of conspiracy, and there is the agency. So I agree. If they had a conspiracy and they were together, they're not conflicted. But, of course, there's the crime fraud exception and all of that. I believe that under this joint defense doctrine, whatever, that if there's any conflict, it cannot be exercised or used. Well, that's interesting because various jurisdictions, some jurisdictions say that. The Seventh Circuit in Illinois says that you can have some divergence, but you cannot be diametrically opposed. And in this case, if State Farm knew what O'Day was doing, and certainly after the filing was there on notice of what he was doing, and if State Farm's position, which seems to be their position of, we had no idea he was stealing, we had no idea he was stealing from us, we had no idea he was doing this, but in fact, factually, he was doing that, there's a direct conflict there. They were conflicted. And even if you give them a very long leash and say, well, you know, maybe they didn't really know, they weren't really sure, or they're still checking, by the time Mr. O'Day gives his deposition where the lawyer for State Farm, who represents State Farm, is sitting there and saying, first of all, initially testifies, I never built for sure, but State Farm knows that he did. They paid literally hundreds of thousands of dollars. They're sitting in a deposition. He initially denies it. Then he claims when he's presented with that, well, that was for a fax. And again, the State Farm lawyer knows that the contract prohibits them, prohibits the lawyers from billing $60 for a fax or a penny for a fax, and additionally, that that billing could never be cost. At that point in time, State Farm was just categorically conflicted. And whatever the joint idea, other than just defeat the plaintiff, from that point forward, they could never really say that they weren't conflicted. They've got their lawyer sitting there listening to another lawyer, who they hired, testify under oath that he didn't do something that they actually know he did a thousand times and that the reason he didn't, that that was just a mistake, and that mistake was because he did something else that he wasn't permitted to do under the law or the contract a thousand times. And then he charged people on garnishments with it. And that lawyer is sitting there listening to it. But they still both want to defeat your case, right? Well, that is absolutely true of every defendant. That does not garner a joint legal defense. I mean, they always have a joint interest. Why doesn't it? Well, actually, there's a case law. Unfortunately, I don't have it on the top of my head, but it is in the brief. There's a case law that says that, and it was a federal court case, that says that's something that every litigant has. It actually might be the McNally case. There are cases where people turn on each other, and when they cross-sue each other, they file, you know, whatever, cross-bends, or criminal defendants might turn. One might flip for the government. But generally speaking, doesn't the law say in this area that we always recognize that defendants might one day turn on each other? But just the fact that that might happen or that there might even be one area where they're not in agreement, as long as they have some common interest, they can communicate confidentially with regard to that common interest. I was just going to say to that common interest. But there is a case law that says the common interest to support a joint defense cannot be solely you want to defeat the plaintiff. That cannot be the sole common interest. It has to be beyond we want them to lose. Otherwise, everybody would have a joint interest. And why would it be so bad if everyone had a joint interest? Well, because it gives a proportional advantage to the defendant. I mean, truly, it absolutely does. Is this one more precisely limited to defendants? Well, it is a defense. It's a joint defense. Well, sure, that's the label we use, but that's not the label usually used around the country, is it? Well, it is used primarily. Their common interest is. But with plaintiffs, again, it's the two lawyers. I think the distinction there is one lawyer with multiple clients who eventually can be conflicted versus two lawyers, separate clients. They're starting out. The only thing they have in common is to beat the plaintiff. Can I ask you two questions before you go? Sure. Okay. Just to clarify, on this question of the privilege log, whether you asked for a privilege log about these post-lawsuit communications for which Mr. Gahan asserted the joint defense doctrine. I do recall that in oral argument, Judge Garcia made a comment, why would I require a privilege log for post-lawsuit? Is that where we need to look to find an example of you saying, I need a privilege log for that? Yes. That's on page 22. And when you look at that whole line where we have the argument and then the differentiation between pre-suit, the communications between Mr. Gahan and Mr. O'Day prior to the time that Mr. Gahan had a lawyer. I mean Mr. O'Day had a lawyer. Sorry. You know, so there were three separate instances. What I said is we did it. We got a privilege log for the pre-suit, the claim files. We got a privilege log for that but not underlying documents. We did not get a privilege log for the communications where Mr. Gahan was doing what we believe to be a fact-finding mission, which would never be privileged. And that's another thing under the joint defense. It has to be privileged in the first instance. They cannot create a joint defense to create a privilege that did not otherwise exist. And without a privilege log, there's no, it's impossible to tell, which is why even the Supreme Court had the Supreme Court comply with that requirement. But we absolutely requested it. We said, Judge, we need a privilege log. How are we even getting there? How do we know? And that came up in the arguments after, I believe, if my memory serves, after Judge Garcia, because it was separate here. You see, first I say there's a joint legal defense in Illinois. I'm saying it is. So the next question is, does it apply here? Can they use it? And I said, well, wait a minute. I need a privilege log. How do we know? So it is absolutely in that record. The conflict with regard to that, I think, was just manifest. And I would just, in closing, just point to the 2615. It's in the complaint. That's the only thing the Court should have been looking at. On agency is a question of fact. It can't be decided on a 2615. Independent contractor, question of fact, can't be decided. Ratification, question of fact, can't be decided on 2615. Their summary judgment, wholly ineffective, absolutely did not comply with the law. And really, one look at it, it should have been denied on its face because, I'm sorry, they didn't attach that as necessary. Thank you. Thank you. I'm pleased to be taken under your advisement. Court is adjourned. Thank you.